# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ALBERT J. PRICE, JR.,**
                 Petitioner,

    v.                                      **Case No. 03-C-849**

**MICHAEL THURMER,**
                 Respondent.

---

## SECOND DECISION AND ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS

---

### I. PROCEDURAL HISTORY

On September 4, 2003, Albert J. Price, Jr. ("Price"), proceeding pro se, filed a petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. His petition was screened by this court in accordance with Rule 4 of the Rules Governing Section 2254 Cases and the respondent was ordered to answer the petition. Following all parties consenting to the full jurisdiction of a magistrate judge, on October 10, 2006, this court denied Price's petition and judgment was entered accordingly.

Price appealed, and the Seventh Circuit Court of Appeals granted Price's request for a certificate of appealability and appointed counsel to assist him. On February 1, 2008, the Seventh Circuit affirmed in part and reversed in part this court's judgment. Price v. Thurmer, 514 F.3d 729, 734 (7th Cir. 2008). In relevant part, the court determined that with respect to Price's claims that his trial counsel was ineffective for "waiving a hearing on Price's mental competence to stand trial and withholding essential information from the court-appointed expert who testified about Price's mental state when he committed the crimes," id. at 732, "there is so much missing from the state appellate court's evaluation of the claims that we cannot determine the reasonableness of that evaluation without asking the district court to take evidence on the matter," id. at 733.

Counsel appointed by the Seventh Circuit agreed to continue to represent Price and were accordingly appointed by this court. On remand, this court permitted the parties to undertake limited discovery related to these issues, and on January 28 and February 4, 2009, the court conducted an evidentiary hearing. Following this hearing, the court permitted the parties to submit post-hearing briefs. The pleadings are now closed and the matter is ready for resolution.

## II. FACTS

As explained by the Wisconsin Court of Appeals,

[t]he convictions arise out of the events that transpired on June 3, 1991. Price struck a little girl with his truck and continued driving. An off-duty police officer observed the accident and pursued Price's truck. Price then smashed into the back of a vehicle, causing a four-car chain reaction collision. Price exited his vehicle, yelling incoherently and swinging a machete. In the melee which followed, Price swung the machete at and injured at least three persons. Bystanders managed to disarm Price and tackle him to the ground. When police arrived they found it necessary to place Price in leg irons because he was so combative. He continued to struggle with police officers even after arriving at the jail.

A competency review was requested on the day of Price's first court appearance. The examining doctor concluded that Price was competent to stand trial. Trial counsel waived Price's right to an evidentiary hearing on competency and did not contest the doctor's finding.

State v. Price, 2002 WI App 134, ¶¶2-3, (00-3209-CR) (April 17, 2002) (per curiam).

Price's present challenge to his conviction is aimed at his trial counsel, William A. DeMark ("DeMark"). Price contends that he was denied the effective assistance of trial counsel because DeMark waived a competency hearing and failed to provide certain information to a court appointed psychological expert.

With respect to the waiver of the competency hearing, DeMark was appointed to represent Price after his initial attorneys requested a competency evaluation. (Docket No. 86 at 4-5.) DeMark was appointed shortly before a hearing was scheduled on the competency issue. (Docket No. 86 at 5.) Because he had just met Price, DeMark requested that the matter be put over for a day. (Docket No. 86 at 5.) The court granted DeMark's request, and after having researched the applicable

2

competency law and meeting with Price for 3½ hours, as well as meeting with the doctor who examined Price, the next day, DeMark waived the hearing on behalf of Price. (Docket No. 86 at 5-8.)

The prosecution of Price continued, and Price answered the charges by pleading not guilty by mental disease or defect ("NGI"). The matter proceeded to a bifurcated jury trial. In phase one, Price was found guilty of the crimes charged in the information. Phase two was to determine whether, as a result of a mental disease or defect, Price "lacked substantial capacity to either appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law." Wis. Stat. § 971.15. The jury was presented with the testimony of three psychological experts who examined Price. There was the state expert who determined that Price was not suffering from a mental disease at the time of the incidence and a defense expert who reached the opposite conclusion.

As is relevant to Price's present petition, there was also a court appointed expert, Dr. Robert Drom, who testified that he was unable to reach a conclusion on the question of whether Price was suffering from a mental disease at the time of the incident. At this second phase, statutorily, only 10 persons on a twelve person jury must agree to a verdict. Wis. Stat. § 971.165(2). Ten jurors determined that Price was not suffering from a mental disease at the time of the crimes; two jurors dissented from this verdict. (Ex. 50 at 202-03.)

Dr. Drom conducted a 1½ hour examination of Price. (Ex. 50 at 9.) At the time of the examination, Dr. Drom had a copy of the criminal complaint, a police report, the court order appointing him to conduct the examination, and a letter from the doctor who examined Price's competency to proceed to trial indicating that Price was competent. (Ex. 50 at 9-10.) Subsequently, Dr. Drom received medical records relating to Price's 1985 hospitalization. (Ex. 50 at 10.) Ultimately, Dr. Drom concluded that the data that he was provided was insufficient to permit him to

reach a conclusion as to whether Price was suffering from a mental disease at the time of the incident. (Ex. 50 at 16.)

When asked to opine as to whether Price was able to appreciate the wrongfulness of his conduct or conform his conduct to the law, Dr. Drom read a lengthy portion of his report that included the opinion that "the time and form of psychotic episode is highly consistent with a substance induced psychosis that is induced by one or another of known psychometric drugs otherwise known as hallucinetic [sic] compound." (Ex. 50 at 18, 21.) At various times throughout his testimony, Dr. Drom speculated that Price's actions may have been motivated by alcohol withdrawal, or the ingestion of alcohol or other drugs, or that Price was malingering. (See generally Ex. 50 at 16-33.)

In his report, Dr. Drom stated: "If reliable witnesses to the subjects [sic] behavior in the preceding 48 hours were available whom [sic] might attest to his behavior, thought content, manner of speech and/or possible ingestion of street drugs on a voluntary or involuntary basis support for his claims of mental defect might be obtained." (Ex. 36 at 5.) Nonetheless, when DeMark asked Dr. Drom about statements by some witnesses who observed Price acting oddly in the days preceding the incident, Dr. Drom testified this additional information did not alter his conclusion that he was unable to make a determination as to whether or not Price was suffering from a mental disease at the time of the incident. (Ex. 50 at 32-33.)

DeMark moved to strike Dr. Drom's testimony on the basis that he did not offer an opinion but merely offered a variety of speculative possibilities. (Ex. 50 at 34-35.) The court denied this motion. (Ex. 50 at 35.) On cross-examination, Dr. Drom noted that alcohol could have been a factor in Price's delusional state either through the ingestion of alcohol or as a result of alcohol withdrawal. (Ex. 50 at 47.)

DeMark testified at the hearing before this court that he likely had a toxicology report from the hospital where Price was admitted after this incident, but he did not give it to Dr. Drom because he either did not have it, had it but did not understand it, or had it and overlooked it. (Docket No. 86 at 33.) DeMark did not deliberately withhold the toxicology report as part of a trial strategy. (Docket No. 86 at 35.) This toxicology report was based upon a blood sample taken from Price on June 5th, two days after the incident, and thus would unlikely be determinative as to whether Price had alcohol in his system at the time of the incident. (Docket No. 88 at 84.)

With respect to the witness statements, Price had these statements in his possession before Dr. Drom produced his report on September 17, 1991. (Docket No. 86 at 28; Ex. 5.) In relevant part, these reports discuss family and friends observing a change in Price's behavior dating as far back as his return from Central America in April or May of 1991. (Ex. 5.) (Exhibit 5 contains reports generated after Dr. Drom's report; only those dated prior to Dr. Drom's report were in DeMark's possession at the time of the report). Numerous people reported that in the days immediately preceding the incident, Price was acting strange, for example, withdrawing from conversations, inquiring, "Have you ever felt like everybody was watching you?," believing he was a god, and was described as jittery, nervous, upset, paranoid, under pressure, possessed, extremely hostile, and evil, all of which were completely out of character for Price, who was described as normally being kind, gentle, extremely sensitive, cheerful, friendly, and "full of smiles." (Ex. 5.)

DeMark also had in his possession reports of law enforcement agencies recounting witness reports of Price's behavior during the incident and while in custody. (Ex. 4.) The police reports of the incident recount an extremely violent and chaotic scene in which Price is attacking everyone within sight with a machete. The incident occurred outside of a fire station and therefore many of the witnesses were firefighters. For example, a firefighter captain reported that as Price was

5

attacking individuals with the machete he "kept yelling something about the Lord and the end of the world." The captain described Price as "just plain berserk."

A lieutenant firefighter reported that Price's attack continued even after Price had been struck by a delivery truck and pinned between the truck and a car; when the truck driver backed off, Price was able to free himself and continue the assault. The lieutenant reported firemen struck Price with a pike but this had no affect upon Price. The lieutenant described Price as "pumped up," and with a wide-eyed expression on his face. Price made comments concerning peace, to the effect of "Do you want peace?" and "You don't want peace?"

Another firefighter also reported that Price made statements regarding peace and also recounted Price saying something to the effect of, "There's more like me. This is just the beginning," as he was being placed in a police wagon. Another lieutenant firefighter described Price as having "a crazy look in his eye" and "ranting and raving." Another witness stated that several times Price raised both arms in the air and "bellowed like a lion." A police officer who assisted in the transport of Price following his arrest reported that Price was mumbling incoherently about "getting people," and chanting "Johnny's gonna die."

When Price first appeared at the Racine County Jail following his arrest, he was disheveled and smelled of urine but no odor of alcohol was detected on his breath. He appeared to not know what he had done and continued to either mumble or yell throughout the early stages of the booking process. At times, he would become violent and seemed impervious to pain, and notably he was not affected by repeated applications of a stun gun. Throughout his stay at the Racine County Jail, Price continued to behave violently, at times continuing to resist being booked and transported to court. Once he was placed in a cell, it appeared that Price had chewed off portions of his dreadlocks. One deputy noted that it was unusual that once Price was placed in a cell by himself, he calmed down quickly, and that later he was able to talk to Price, and Price seemed rational and appeared to act

6

normally. Overall, Price's detention at the Racine County Jail was marked by repeated cycles where periods of calm were then followed by periods of exceptional violence.

Also testifying at the evidentiary hearing before this court were attorney Franklyn Gimbel ("Gimbel") and Dr. Kenneth Smail. Dr. Smail is a diplomat in forensic psychology and is the director of the Wisconsin Forensic Unit, a private clinic contracted with the State of Wisconsin to provide competency examinations of adults facing criminal charges in Wisconsin circuit court. (Docket No. 88 at 14-16.) He has evaluated the competency of hundreds of defendants and accordingly testified as an expert hundreds of times. (Docket No. 88 at 17-18.) Dr. Smail has extensive experience in training both mental health and legal professionals on issues related to forensic psychology. (Docket No. 88 at 18-19.) Dr. Smail's report was received as Exhibit 120. In this report, Dr. Smail concludes that, based upon all the evidence he reviewed, which includes the toxicology report and the statements of Price's friends and family regarding Price's conduct in the days before the incident, Price's behavior is consistent with schizophrenia. (Ex. 120 at 4.)

Gimbel is an experienced criminal defense attorney who has represented three to six clients at trial regarding NGI defenses, in addition to 12-20 cases where there was an issue of the defendant's competence to proceed. (Docket No. 89 at 5-6.) Over the respondent's objection, the court permitted Gimbel to testify as an expert. Gimbel opined that DeMark's representation of Price fell below prevailing professional norms. (Docket No. 89 at 9.) Additional facts shall be recounted below as needed.

## III. STANDARDS OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), [a federal court] may grant a petition for habeas relief from a state court judgment only in one of two limited circumstances: if the state court decision (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Smith v. Grams, 565 F.3d 1037, 1043 (7th Cir. 2009).

The court shall presume that the state court's factual determinations are correct, and the petitioner may rebut this presumption only by clear and convincing evidence. Id. (citing § 2254(e)(1)). The petitioner "bears the burden of showing that the state court's finding of fact or its application of federal law was not only erroneous, but unreasonable." Id. (citing Waddington v. Sarausad, 129 S. Ct. 823, 831 (2009); Sturgeon v. Chandler, 552 F.3d 604, 609 (7th Cir. 2009)). Under the "unreasonable application" prong of (d)(1), it is not enough for the federal court to simply disagree with the conclusion of the state court; the state court's application of Supreme Court precedent must be so erroneous as to be objectively unreasonable. Middleton v. McNeil, 541 U.S. 433, 436 (2004); Yarborough v. Gentry, 540 U.S. 1, 5 (2003).

Price contends that the court should not apply this well-established standard of review in the present case because the Wisconsin Court of Appeals did not fully address Price's ineffective assistance of counsel claims. (Docket No. 90 at 19-20.) Therefore, Price contends the court should afford no deference to the decision of the state court. (Docket No. 90 at 19-20.) The respondent contends that a deferential standard of review should apply to all of Price's claims that are properly before this court. (Docket No. 96 at 16-18.)

Price correctly states the law that under certain circumstances where the state court fails to adjudicate an aspect of a petitioner's claim on its merits, the court applies the de novo standard of review applicable before AEDPA. See, e.g., Earls v. McCaughtry, 379 F.3d 489, 492 (7th Cir. 2004). If the analysis is multi-pronged, such as that applicable to ineffective assistance of counsel claims, see Strickland v. Washington, 466 U.S. 668 (1984), and the state court addressed only one prong, for example the unreasonable performance prong, the federal court shall review the state court's unreasonable performance analysis deferentially while applying a de novo standard of review to the prejudice prong. See id.

8

With respect to Price's claim that DeMark was ineffective for having waived Price's competency hearing, the Wisconsin Court of Appeals determined that Price was not prejudiced by any alleged error; it did not address whether DeMark's actions were unreasonable. Price, 2002 WI App 134, ¶29. Accordingly, the court shall apply a deferential standard of review to the state court finding that Price was not prejudiced and, if necessary, shall review the unreasonableness prong of the Strickland analysis under the pre-AEDPA standard.

Turning to Price's claims that DeMark was ineffective for failing to provide Dr. Drom with all necessary information, the court concurs with Price's contention that the Court of Appeals' analysis of these claims is not entirely clear. The following two paragraphs appear the most relevant portion of the Court of Appeals' decision:

> Next, Price contends that trial counsel failed to make an adequate investigation of his mental health records, specifically a finding that Price suffered from paranoid schizophrenia and alcohol abuse. He relates the absence of complete investigation to a failure to provide Dr. Drom medical data necessary to permit Dr. Drom to form an opinion. "A defendant who alleges a failure to investigate on the part of his or her counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the case." State v. Leighton, 2000 WI App 156, ¶38, 237 Wis. 2d 709, 616 N.W.2d 126. Price fails to do this.

> Moreover, mental illness does not necessarily translate to a finding of NGI. This is particularly true here where reports were that Price had not demonstrated any signs or symptoms of any significant mental disorder during his stay while being evaluated for competency. Also, trial counsel informed Dr. Drom of the pertinent eyewitness accounts of Price's behavior during the weekend before the crimes. Dr. Drom indicated at trial that those accounts did not change his inability to form an opinion since he could not determine the credibility of the behavioral observations. Giving Dr. Drom the actual reports would not have changed his testimony because he still could not assess the credibility of the reported observations.

Price, 2002 WI App 134, ¶¶17-18.

Notably absent from the Court of Appeals' decision is any explicit discussion of DeMark's failure to provide Dr. Drom with the toxicology report. Further, aside from stating that "trial counsel informed Dr. Drom of the pertinent eyewitness accounts of Price's behavior during the weekend before the crimes," and the statement that "Dr. Drom indicated at trial that those accounts

9

did not change his inability to form an opinion since he could not determine the credibility of the behavioral observations," Price, 2002 WI App 134, ¶18, there is no explicit discussion of whether DeMark was ineffective with respect to this claim. Specifically, the court did not discuss DeMark's actions using the terms "unreasonable" and "prejudicial."

> When a state court is silent with respect to a habeas corpus petitioner's claim, that claim has not been "adjudicated on the merits" for purposes of § 2254(d). See Hough v. Anderson, 272 F.3d 878, 904 n.13 (7th Cir. 2001) (reviewing the petitioner's claim de novo because "the Supreme Court of Indiana did not address this argument specifically in its opinion"). As a practical matter, a federal court cannot apply the deferential standard provided by § 2254(d) in the absence of any state court decision on the issue. See Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001) ("AEDPA imposes a requirement of deference to state court decisions, but we can hardly defer to the state court on an issue that the state court did not address."); Hogan v. Gibson, 197 F.3d 1297, 1306 (10th Cir. 1999) (holding that because the state court "made no findings" as to the merits of the petitioner's claim, "it is axiomatic that there are no findings to which we can give deference" and thus § 2254(d) does not apply). As we said in Braun, "accordingly, we shall not employ the standard of review set forth in AEDPA but, rather, must rely upon the general standard as set forth in 28 U.S.C. § 2243," which requires that we "'dispose of the matter as law and justice require.'" 227 F.3d at 917 (quoting § 2243). See also Maples v. Stegall, 340 F.3d 433, 436 (6th Cir. 2003); Norde v. Keane, 294 F.3d 401, 410 (2d Cir. 2002); Hameen v. State of Del., 212 F.3d 226, 248 (3d Cir. 2000); Mueller v. Angelone, 181 F.3d 557, 570 n.9 (4th Cir. 1999).

Canaan v. McBride, 395 F.3d 376, 382-83 (7th Cir. 2005) (citing also Wiggins v. Smith, 539 U.S. 510 (2003)); see also Rodriguez v. Chandler, 382 F.3d 670, 673 (7th Cir. 2004); Harding v. Sternes, 380 F.3d 1034, 1044-45 (7th Cir. 2004); Earls, 379 F.3d at 494.

In this court's opinion, it is fair to conclude that the Wisconsin Court of Appeals held that DeMark's failure to give Dr. Drom the witness reports was not prejudicial to Price because, as the court determined, "giving Dr. Drom the actual reports would not have changed his testimony because he still could not assess the credibility of the reported observations." Price, 2002 WI App 134, ¶18. Accordingly, the court shall apply the deferential AEDPA standard of review to the Wisconsin Court of Appeals' decision that DeMark's failure to provide Dr. Drom with the

eyewitness reports was not prejudicial; the court shall apply the non-deferential pre-AEDPA standard of review to the question of whether this failure was unreasonable.

As for the matter of the toxicology report, the Court of Appeals' decision contains no explicit discussion regarding Price's present contention that DeMark was ineffective for failing to provide the toxicology report to Dr. Drom. The respondent contends that the Court of Appeals' failure to address this issue is hardly surprising because Price failed to raise it in his brief. Therefore, the respondent argues, this claim was procedurally defaulted. (Docket No. 96 at 18.) Alternatively, the respondent contends that Price abandoned this claim by not presenting it in his appeal to the Seventh Circuit Court of Appeals. (Docket No. 96 at 18.)

The court concurs with the respondent that Price's brief to the Wisconsin Court of Appeals did not specifically address the contention that DeMark was ineffective for failing to provide Dr. Drom with the toxicology report. (Docket No. 3, Ex. 15.) Rather, Price spoke in broad generalities, contending that DeMark was ineffective because he failed to provide Dr. Drom with "medical data," or "all of the crucial/relevant documents and reports." (Docket No. 3, Ex. 15.)

In his petition for review to the Wisconsin Supreme Court, (Docket No. 3, Ex 16), Price appeared to narrow his argument, discussing only DeMark's failure to provide Dr. Drom with eyewitness reports; at no point did Price contend that DeMark was ineffective for failing to provide Dr. Drom with the toxicology report.

In his petition before this court, Price discussed DeMark's failure to provide Dr. Drom with the toxicology report as one aspect of DeMark's alleged ineffectiveness with respect to providing information to Dr. Drom. (Docket No. 2 at 28 n. 20.) Although this discussion was offered only in a footnote in the memorandum he submitted in support of his petition, rather than explicitly within the petition itself, in light of this court's duty to liberally construe the pleadings of pro se litigants, the court regards this as sufficient.

11

Even if being considered as part of his petition, Price did not mention the toxicology report in his brief to the Seventh Circuit Court of Appeals; he instead reverted to discussing a general failure of DeMark to provide Dr. Drom with relevant information. This raises the issue of waiver or abandonment.

As a preliminary matter, the court will determine if Price's claim that DeMark was ineffective for failing to provide Dr. Drom with the toxicology report is properly before this court. In other words, was it sufficiently raised in state court in order to satisfy the exhaustion doctrine?

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). Thus, in order to exhaust a claim, the petitioner must present it in a petition for discretionary review with the Wisconsin Supreme Court. Id.; see also Rodriguez v. Scillia, 193 F.3d 913, 916-18 (7th Cir. 1999). "If a prisoner fails to present his claims in a petition for discretionary review to a state court of last resort, those claims are procedurally defaulted." Rodriguez, 193 F.3d at 917.

"[E]xhaustion of state remedies requires that petitioners 'fairly present' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)) (certain quotation marks deleted).

> Fair presentment requires a petitioner to put forward operative facts and controlling legal principles. Whether [the petitioner] has done so depends on several factors, including: (1) whether the petitioner relied on federal cases that engage in constitutional analysis; (2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; (3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and (4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation.

Case 2:03-cv-00849-AEG   Filed 10/21/09   Page 12 of 26   Document 99

Sweeney v. Carter, 361 F.3d 327, 332 (7th Cir. 2004) (quotation marks deleted) (citing Wilson v. Briley, 243 F.3d 325, 327 (7th Cir. 2001); Verdin v. O'Leary, 972 F.2d 1467, 1473-74 (7th Cir. 1992)).

In his petition for review by the Wisconsin Supreme Court, Price discussed only DeMark's failure to provide Dr. Drom with the reports of persons who observed Price before, during, and immediately after the incident, information as to Price's mental health history, and the police or sheriff's reports relating to Price's behavior at the time of the incident, his arrest, and during his subsequent detention at the Racine County Jail. There is nothing in the petition for review that could be interpreted as raising the claim that DeMark was ineffective for failing to provide Dr. Drom with the toxicology report. Accordingly, because Price did not present this issue to the Wisconsin Supreme Court in his petition for review, this court concludes that Price has failed to exhaust his state court remedies with respect to this claim.

The fact that Price did, at all levels of the appellate process, present some variety of the claim that his trial counsel was ineffective for failing to provide certain information to Dr. Drom, is not sufficient to exhaust his state court remedies as to all variations of this claim. In order to permit a court to properly review the merits of a defendant's claim, Strickland requires a defendant to specifically identify the acts or omissions of counsel that were allegedly unreasonable. Strickland, 466 U.S. at 690.

Although both claims contend that trial counsel was ineffective, a claim that an attorney was ineffective for failing to provide an expert with witness reports is factually distinct from a claim that an attorney was ineffective for failing to provide the expert with toxicology reports. See Balfour v. Haws, 892 F.2d 556, 563 (7th Cir. 1989). Therefore, Price's claim that his trial counsel was ineffective for failing to provide Dr. Drom with the toxicology report was procedurally defaulted.

Federal courts may only review defaulted claims if the petition shows cause for failure to raise them at the appropriate time and actual prejudice which resulted from

13

such failure. See Wainwright v. Sykes, 433 U.S. 72, 91 (1977). Absent such a showing, a defaulted claim is reviewable only if refusal to consider it would result in a "fundamental miscarriage of justice," that is, where "a constitutional violation has probably resulted in the conviction of one who is actually innocent . . . ." Murray v. Carrier, 477 U.S. 478, 495-96 (1986) (internal quotations and citations omitted); see also Coleman [v. Thompson], 501 U.S. [722,] 750 [(1991)]. This standard requires a petitioner to show that it is more likely than not that no reasonable juror would have convicted him. Schlup v. Delo, 513 U.S. 298, 329 (1995).

Rodriguez, 193 F.3d at 917.

Price made no showing of cause for his failure to exhaust. Therefore, in reviewing a defaulted claim, the court need only determine whether a refusal to reach the merits might work a fundamental injustice. Id. (citing Howard v. O'Sullivan, 185 F.3d 721, 726 (7th Cir. 1999)).

However, exhaustion is an affirmative defense that ordinarily must be raised by the respondent or be lost. See, e.g., Trest v. Cain, 522 U.S. 87, 90 (1997). It should be noted that this is the first time that the respondent has contended that Price procedurally defaulted any of his claims. In fact, in response to the petition, the respondent admitted that "Price has exhausted his state remedies with respect to the claims asserted in his petition." (Docket No. 11 at 10, ¶11.) Thus, it is possible to argue that the respondent "has waived (or, more properly, forfeited) this argument." Canaan v. McBride, 395 F.3d 376, 382 (7th Cir. 2005) (citing Gregory-Bey v. Hanks, 332 F.3d 1036, 1043 (7th Cir. 2003) ("As a procedural default is not jurisdictional, any argument that [a habeas petitioner] has defaulted his . . . claim can be waived by the government."); Hernandez v. Cowan, 200 F.3d 995, 997 (7th Cir. 2000) (finding "waiver of waiver, now a well-established doctrine," where the State failed to object to a habeas petitioner's failure to seek state supreme court review in his direct appeal and post-conviction proceedings); cf. Momient-El v. DeTella, 118 F.3d 535, 540 (7th Cir. 1997) (refusing to find waiver of waiver by the State where it presented its procedural default argument for the first time on appeal to the Seventh Circuit).

But as this court notes above, it is only by liberally construing Price's pro se petition (or more accurately a footnote in his memorandum in support of his petition) that the court is able to

14

conclude that the issue was properly raised. Thus, is the respondent's concession sufficient to waive an exhaustion objection to a claim that can be gleaned from the petition only by liberally interpreting a footnote in the petitioner's memorandum of law?

It is not necessary for the court to answer this question because the court concludes that Price has abandoned this claim by not raising it in his appeal to the Seventh Circuit. Price contends, in a footnote, that he raised the issue of the toxicology report on page 32 of his brief to the Seventh Circuit. (Docket No. 98 at 10-11, n5.)

Page 32 of Price's brief to the Seventh Circuit states the following:

And most significantly, Dr. Drom's report and trial testimony reveal that his knowledge of Mr. Price's mental health history was very limited. (SE. 1 at 20, SE 26 at 4.) For example, Dr. Drom's report only mentioned one prior instance of psychiatric hospitalization and indicated that Dr. Drom is not aware of any "history of other mental aberrations and ... no history of any previous treatment from other sources for any ongoing major mental disorder." (SE. 26 at 4.)

As this Court recognized in Brown, a defense attorney's failure to provide to a psychiatric expert witness" information concerning [the defendant's] medical history renders . . . [that expert's] opinions on [ ]competency and sanity useless and unreliable." 304 F.3d at 697. In this case, it is clear that Dr. Drom only considered a small portion of the available information in formulating his opinion on Mr. Price's mental condition at the time of the incident. This vacuum was caused, in large part, by Mr. Price's trial counsel's failure to reasonably investigate Mr. Price's mental health history and to provide this information to Dr. Dram. (SE. 3 at 76-79, 95, 97-98.) As Mr. Price's Supplemental Brief points out, there were at least 12 documented instances of past mental illness which could have been discovered with reasonable investigation, as well as used to test Dr. Drom's evaluation. (R. 15 at 24-26.)

(Docket No. 96-2 at 7.) Nowhere on this page, or for that matter anywhere else in the excerpt of his initial brief provided by the respondent, does Price raise the issue of the toxicology report.

A party's failure to address or develop a claim in its opening brief constitutes a waiver of that claim, for "it is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel . . ." Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 668 (7th Cir. 1998), (citing Sere v. Bd. of Trustees of the Univ. of Ill., 852 F.2d 285, 287 (7th Cir. 1988)). In order to develop a legal argument effectively, the facts at issue must be bolstered by relevant legal authority; a perfunctory and undeveloped assertion is inadequate to raise a separate basis for appeal. See Indurante v. Local 705, Int'l Bhd. of Teamsters, 160 F.3d 364, 366 (7th Cir. 1998).

15

<u>330 West Hubbard Restaurant Corp. v. United States</u>, 203 F.3d 990, 997 (7th Cir. Ill. 2000) (quoting <u>United States v. Hook</u>, 195 F.3d 299, 310 (7th Cir. 1999)).

Price failed to present to the Seventh Circuit his claim that DeMark was ineffective for failing to provide Dr. Drom with the toxicology report. Accordingly, Price abandoned the claim. Simply because Price prevailed in obtaining a remand of his petition to the district court, Price is not permitted to revive abandoned arguments. Accordingly, having abandoned this claim before the Seventh Circuit, the claim is not properly before this court.

Even if this court were to conclude that Price exhausted his state court remedies with respect to this claim (or the respondent waived his opportunity to raise this defense) and that Price properly raised the claim before the Seventh Circuit, and thus the claim was properly before this court, as the court discusses below, the court would nonetheless conclude that Price's claim would fail upon its merits.

Therefore, in summary, the following claims are properly before this court: (1) Price was denied the effective assistance of counsel when DeMark waived his competency hearing; (2) Price was denied the effective assistance of counsel by DeMark's failure to provide Dr. Drom with the reports regarding Price's behavior in the days before the incident. The court of appeals determined that with respect to each of these claims, Price was not prejudiced by any allegedly unreasonable performance by DeMark. Accordingly, the court shall review this prong of the <u>Strickland</u> analysis under the deferential AEDPA standard. As for the unreasonable performance prong of the <u>Strickland</u> analysis, the court shall analyze this prong under the de novo pre-AEDPA standard.

## IV. ANALYSIS

A petitioner seeking relief pursuant to 28 U.S.C. § 2254 due to an alleged denial of the effective assistance of counsel must demonstrate that the state court's decision on this issue was contrary to or involved an unreasonable application of <u>Strickland v. Washington</u>, 466 U.S. 668

(1984). <u>Wright v. Van Patten</u>, 128 S. Ct. 743 (2008) (per curiam). Under <u>Strickland</u>, a petitioner is entitled to relief only if he can prove two elements. <u>Goodman v. Bertrand</u>, 467 F.3d 1022, 1027 (7th Cir. 2006). First, the petitioner must prove that his counsel's performance was unreasonable. In assessing the reasonableness of counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," <u>Raygoza v. Hulick</u>, 474 F.3d 958, 962 (7th Cir. 2007) (quoting <u>Strickland</u>, 466 U.S. at 689). A court assessing the reasonableness of an attorney's performance must be cautious not to view counsel with the distorted perspective offered by hindsight; rather, every effort must be made to evaluate an attorney's performance from the perspective of counsel at the time. <u>Strickland</u>, 466 U.S. at 689. An attorney's actions do not become unreasonable simply because they proved unsuccessful. <u>Id.</u>

Second, the petitioner must prove that this unreasonable conduct prejudiced his defense. It is not enough for petitioner to show that the attorney's error had "some conceivable effect on the outcome." <u>Raygoza</u>, 474 F.3d at 962-63 (quoting <u>Strickland</u>, 466 U.S. at 693). But on the opposite side, it is not necessary for the petitioner to demonstrate that the error more likely than not altered the outcome of the case. <u>Id.</u> Rather, the petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 694).

**A. Waiver of Competency Hearing**

Under Wisconsin law, a person is competent to stand trial provided he has the "mental capacity to understand the proceedings [and] assist in his or her own defense." Wis. Stat. § 971.13. "[W]here defense counsel has a reason to doubt the competency of his client to stand trial, he must raise the issue with the trial court. The failure to raise the issue of competency makes the counsel's representation fall below an objective standard of reasonableness." <u>State v. Johnson</u>, 133 Wis. 2d

207, 220, 395 N.W.2d 176, 182 (1986). This reasonable basis standard is the same standard that Wis. Stat. § 971.14 imposes upon the trial court.

In the report submitted by Dr. Robert D. Miller, M.D., Ph.D., following his evaluation of Price's competency, in relevant part, Dr. Miller reported the following:

> In my competency interview with him, Mr. Price was aware of the charges against him and of the potential penalties he could suffer if convicted. He was able to define and discuss the pleas of guilty, not guilty, no contest, and not guilty by reason of mental disease in considerable and accurate detail. He was able to discuss the roles of judge, jury, prosecutor, and defense attorney. He was able also able to discuss procedural issues, such as plea bargaining, with an adequate understanding. He did state that he could not recall what he was doing at the time of the alleged crimes because of loss of consciousness sustained in the efforts to apprehend him.
>
> Therefore, it was my opinion that Mr. Price possessed the requisite mental capacities to understand the nature of the proceedings against him and to cooperate with counsel in the preparation of a defense. While it was true that if he was suffering amnesia for the events surrounding the alleged crimes (and there is no definitive test for the credibility of such claims), it might affect his ability to assist his attorney in the preparation of a defense, it is also true that traumatic amnesia does not respond to any psychiatric treatment. It was further my understanding that amnesia per se does not render someone incompetent to proceed.

(Ex. 33.) Prior to waiving the competency hearing, DeMark reviewed this report with Price in a 3½ hour conference. (Ex. 84 at 43.)

As might be expected in light of the fact that the relevant events occurred about 18 years ago, DeMark testified he does not have any independent recollection as to what he discussed with Price during this meeting. (See Docket No. 86 at 23.) However, the notes that DeMark produced during this meeting were received as Exhibit 1. DeMark recorded in these notes Price's detailed recounting of conversations and certain events that occurred in the days preceding the incident and included details such as full names of relevant persons, addresses, and phone numbers. (Ex. 1.) Price also recounted relevant portions of his medical history. (Ex. 1.) However, Price reported that he did not recall anything of the incident. (Ex. 1.)

In light of DeMark's own lengthy meeting with Price and Dr. Miller's conclusion, DeMark had no "reason to doubt the competency of his client to stand trial." The only obvious and potentially relevant deficit that DeMark was aware of was the fact of Price's failure to recall the acts with which he was charged. However, it is well-established under Wisconsin law that "amnesia does not by itself either render a defendant incompetent to stand trial or, if tried, unable to be tried fairly." State v. McIntosh, 137 Wis. 2d 339, 347 404 N.W.2d 557, 561 (Ct. App. 1987); see also State v. Leach, 122 Wis. 2d 339, 344-47 363 N.W.2d 234, 236-38 (Ct. App. 1984) (rev'd on other grounds 124 Wis. 2d 648, 370 N.W.2d 240 (1985)).

Rather, under Wisconsin law, amnesia is generally evaluated post-trial to determine whether the defendant's amnesia prevented the defendant from obtaining a fair trial. Id. at 349, 404 N.W.2d at 562. In making this evaluation, the court shall consider the following six factors:

> (1) The extent to which the amnesia affected the defendant's ability to consult with and assist his lawyer.
>
> (2) The extent to which the amnesia affected the defendant's ability to testify in his own behalf.
>
> (3) The extent to which the evidence in suit could be extrinsically reconstructed in view of the defendant's amnesia. Such evidence would include evidence relating to the crime itself as well as any reasonably possible alibi.
>
> (4) The extent to which the Government assisted the defendant and his counsel in that reconstruction.
>
> (5) The strength of the prosecution's case. Most important here will be whether the Government's case is such as to negate all reasonable hypotheses of innocence. If there is any substantial possibility that the accused could, but for his amnesia, establish an alibi or other defense, it should be presumed that he would have been able to do so.
>
> (6) Any other facts and circumstances which would indicate whether or not the defendant had a fair trial.

Id. (quoting Wilson v. United States, 391 F.2d 460, 463-64 (D.C. Cir. 1968)).

19

In the present case, the petitioner has failed to demonstrate that there was any reason for DeMark to reasonably suspect that Price was incompetent to proceed to trial. Further, it is also important to note that although DeMark waived the competency hearing, at no point did DeMark waive Price's right to challenge his competence to proceed. If at any time during the subsequent proceedings, DeMark, or the court for that matter, was presented with a reason to suspect that Price was incompetent, the proceedings would have been suspended. See Leach, 122 Wis. 2d at 344, 363 N.W.2d at 236 ("The inquiry as to competency is coterminous with the entire criminal proceeding. It may be commenced at any phase and may be renewed once it has been initiated."). Accordingly, Price has failed to demonstrate that DeMark's decision to forego a competency hearing was objectively unreasonable.

As for the prejudice element of the Strickland analysis, Price has failed to demonstrate that he was prejudiced by the waiver of the competency hearing. Specifically, Price has failed to demonstrate that he was incompetent to proceed to trial. Unlike certain actions that might be the subject of a defendant's ineffective assistance of counsel claim, in the area of a defendant's competency to proceed, it is not only defense counsel that is obliged to act. As noted above, Wis. Stat. § 971.14 requires the court to intervene if there is reason to suspect that a defendant is competent to proceed. The fact that the court never intervened is a strong indication that there was no reason to doubt Price's competence.

Further, as this court noted in its prior decision and order, although Price has a long record of mental illness, the presence of mental illness does not mean that a defendant "lacks substantial mental capacity to understand the proceedings or assist in his or her own defense." Wis. Stat. § 971.13. Price's courtroom outbursts might indicate that he was suffering from mental illness, but the nature of these outbursts—attacking the veracity of witness statements—indicates an understanding of the proceedings against him.

20

DeMark's own notes also demonstrate that Price was able to provide detailed information about his mental state immediately before the incident and thus was able to assist in his defense by providing information and identifying witnesses who would be able to corroborate his NGI defense. Finally, the report of Dr. Miller indicates that Price was competent to proceed. Accordingly, Price has failed to demonstrate that he was incompetent to proceed. Therefore, the court is unable to conclude that the Court of Appeals' conclusion that Price was not prejudiced by DeMark's waiver of the competency hearing was contrary to, or involved an unreasonable application of *Strickland*.

### B. Failure to Provide Reports to Dr. Drom

Dr. Drom stated the following in his report, which was received as Exhibit 36:

The subjects [sic] description of the events and perceptions of the two days preceding the reported events of Monday 6/3/91 are consistent with a [sic] acute psychotic episode. They are remarkably similar to events and behaviors described by Fred Will, M.D. during a psychiatric hospitalization at St. Luke's Hospital admission date 8/12/85 through approximately 8/23/85. Antecedent drugs of abuse are denied by the subject although his report is variable in the amount and frequency of alcohol abuse prior to the events of 6/3/91. The credibility of the subjects [sic] reports regarding these antecedent events and his perceptions and beliefs cannot be substantiated by this examiner and there is no specific or generally known definitive test for such credibly. The form of the psychosis described is that of an acute onset short-lived episode with rapid clearing. The subject described only two such events ie…the one in 1985 during hospitalization at St. Luke's and the current episode. The subject gives no history of other mental aberrations and certainly gives no history of any previous treatment from other sources for any ongoing major mental disorder. He denies taking any current medication or having taken any medications in the past on the sustained basis. . . . It is the examiners [sic] opinion to a reasonable degree of medical certainty that the type and form of psychotic episode described is highly consistent with a substance induced psychosis that is induced by one or another known psychotometic drugs otherwise known as hallucinogenic compounds or by sympathomimetic compounds. The subject denies any intake of such compounds or drugs, but does claim "somebody put something in my drink on Saturday." Again the credibility of such claims cannot be verified. Upon the subjects [sic] apprehension and arrest had urine samples been taken for forensic purposes to identify the possible presence of such compound, clarity might be shed upon this issue. *If reliable witnesses to the subjects [sic] behavior in the preceding 48 hours were available whom [sic] might attest to his behavior, thought content, manner of speech and/or possible ingestion of street drugs on a voluntary or involuntary basis support for his claims of mental defect might be obtained.* Actual verification of the presence of the psychosis or its causes cannot be attested to by this examiner from this observational vantage point. Dr. Robert Miller's observation of the subject does not indicate the

21

date first seen by him only the most recent ie…6/20/91. There is no mention in the materials supplied to this examiner of any forensic evidence such as urine samples for drug abuse. There does not appear to be adequate evidence of on going Chronic Mental Disorder to support findings of exacerbation by stress.

(Ex. 36) (emphasis added).

At the time that Dr. Drom submitted this report, DeMark had various police, (Ex. 4), and private investigator reports, (Ex. 5), wherein witness accounts of Price's behavior are recounted. However, DeMark failed to provide these reports to Dr. Drom.

Beginning with the reasonableness prong, the court finds that there is an insufficient basis to conclude that DeMark withheld the reports from Dr. Drom as part of any sort of a strategy. For example, in a post-conviction hearing in state court, DeMark testified that he believed he had provided Dr. Drom with the witness reports. (Ex. 84 at 54-56.) Rather, the evidence indicates that DeMark simply made a mistake. And although the court concludes that DeMark did not have a strategic reason to withhold the reports and simply mistakenly failed to give the reports to Dr. Drom, this does not mean that DeMark's performance was unreasonable. Yarborough v. Gentry, 540 U.S. 1, 8 (2003).

Price contends that DeMark's conduct was contrary to the ABA Criminal Justice Section Standards regarding mental health, specifically Standard 7-3.5(b) which states in relevant part:

> The attorney initiating an evaluation should take appropriate measures to obtain and submit to the evaluator any record or information that the mental health or mental retardation professional regards as necessary for conducting a thorough evaluation on the matter(s) referred. Ordinarily, such records and information will include relevant medical and psychological records, police and other law enforcement reports, confessions or statements made by defendant, investigative reports, autopsy reports, toxicological studies, and transcripts of pretrial hearings. The attorney should also obtain and submit to the evaluator any other record or information that the attorney believes may be of assistance in facilitating a thorough evaluation on the matter(s) referred.

As the respondent points out, the ABA Standards are not determinative on the question of reasonableness, but rather are merely guides. See Wiggins v. Smith, 539 U.S. 510, 524 (2003).

22

Although the ABA Standards may be merely guidelines rather than hard and fast rules, the court nonetheless concludes that DeMark's failure to provide Dr. Drom with the witness reports was unreasonable. The fact that DeMark's conduct ran afoul of the ABA Standards is simply supportive of this court's conclusion.

The significance of the witness reports should have been readily apparent to a reasonable attorney. For example, the defense expert was provided with the reports and his testimony, which occurred before Dr. Drom testified, makes clear that the information contained in these reports was highly significant to his conclusion that Price was NGI. (See Ex. 48 at 153-55.) In fact, DeMark appeared to recognize that the information contained in these witness reports was so significant to the issue of NGI that he went so far as to seek to have the defense expert prepare a chart while testifying outlining the statements of the witnesses and how that statement impacted his conclusion. (Ex. 49 at 3-28.) After a lengthy discussion outside the presence of the jury, the court eventually ruled that such witness-by-witness evaluation was inappropriate. (Ex. 49 at 27-28.)

But the most compelling fact that indicates the unreasonableness of DeMark's inaction is the fact that Dr. Drom explicitly noted the significance of such witness information in his report but yet this did not cause DeMark to provide the statement to Dr. Drom. Dr. Drom stated in his report that "reliable witnesses to the subjects [sic] behavior in the preceding 48 hours . . . [to] attest to his behavior, thought content, manner of speech and/or possible ingestion of street drugs on a voluntary or involuntary basis," were needed to possibly provide "support for his claims of mental defect," (Ex. 36 at 5). Because DeMark did not provide Dr. Drom with these documents after being explicitly informed of the fact that such statements were significant to Dr. Drom's conclusion, it is clear to this court that DeMark's conduct was unreasonable. Therefore, the court must turn to the final question of whether or not DeMark's unreasonable conduct resulted in prejudice for Price.

As noted above, it is the conclusion of this court that because the court of appeals adjudicated this prong of the ineffective counsel claim upon its merits, the court must apply the deferential post-AEDPA standard of review. Thus, Price is entitled to relief only if he is able to demonstrate that the court of appeals' conclusion that DeMark's inaction was not prejudicial was not only erroneous, but rather was objectively unreasonable. In relevant part, the court of appeals stated:

> trial counsel informed Dr. Drom of the pertinent eyewitness accounts of Price's behavior during the weekend before the crimes. Dr. Drom indicated at trial that those accounts did not change his inability to form an opinion since he could not determine the credibility of the behavioral observations. Giving Dr. Drom the actual reports would not have changed his testimony because he still could not assess the credibility of the reported observations.

Price, 2002 WI App 134, ¶18.

At trial, there was the following exchange between Dr. Drom and the prosecutor:

Q: . . . Did you have or receive any information from an investigator for the defense as to hallucinations or unusual behavior by the defendant in the several days preceding the June 3rd incident?

A: I didn't talk to any investigator for the defense. I'm not sure what you're –

Q: Did you receive any reports or any information regarding any such observed behavior?

A: The defense attorney had a session with me in the office and questioned the statement that I had made regarding reliable witnesses as to his mental state and actions in the preceding forty-eight hours. He brought up some statements. I don't remember exactly what they were, but descriptions of apparent observed distortion by other witnesses.

Q: Do those observation that were related to you, basically third or fourth hand, cause you to change your diagnosis in any way?

A: I don't know that I have a full diagnosis. I am attempting to reconstruct or to name a—name conditions or a condition that would explain the putative event and put a different descriptions [sic] of symptoms by this defendant. I do not know whether that condition existed in retrospect.

Q: Okay. What you're saying, Doctor, to make it absolutely plain for the jury, is you don't have enough information to conclude the defendant has a mental disease of defect; is that correct?

A: That's correct.

Q: And you don't have any information to tell you that he was suffering from that conditions [sic] on June 3rd, 1991 at 4:30 or 4:35 p.m.; is that correct?

A: I have a series of statement by a number of observed who describe situations and events. I am trying to put together retrospectively a diagnosis that would fit that situation and one that seems to fit it best for me, in an explanatory way, is delirium, toxic delirium of some kind, either alcohol withdrawal or drugs.

(Ex. 50 at 32-33.)

Later, on re-direct examination, the prosecutor asked if the information about the witnesses' observations that he received from DeMark would have affected his ability to make a conclusion to a reasonable degree of medical certainty. Dr. Drom stated:

Without firsthand hearing or seeing transcription of those witnesses, I don't think I could do it to a degree of medical certainty. If that testimony is available and considered to be from reasonable and truthful witnesses by the Court, I think I would have to leave that to the Court, I cannot make that statement definitively.

(Ex. 50 at 62.)

The court is unable to conclude that the determination of the Wisconsin Court of Appeals was objectively unreasonable. Dr. Drom was clear in his testimony that he believed it was necessary for him to be able to assess the credibility of the witness in order to place any reliance on the witness' recounting of Price's behavior. There is no evidence to indicate that rolling back a layer of hearsay by permitting Dr. Drom to review the actual reports rather than hearing DeMark's recounting of the content of those reports would have changed Dr. Drom's inability to make a determination with the requisite degree of medical certainty. The investigator and police reports would have still have been hearsay, and thus, in the view of Dr. Drom, insufficient for his purposes.

Accordingly, because Price has failed to demonstrate that the Wisconsin Court of Appeals' decision that DeMark's failure to provide Dr. Drom with the witness reports resulted in prejudice to

25

Price was an unreasonable application of <u>Strickland</u>, Price is not entitled to federal habeas corpus relief as to his ineffective assistance of counsel claim.

Finally, as for the toxicology report, even if the court were to conclude that Price's claim regarding the DeMark's failure to provide Dr. Drom with the toxicology report was properly before it, applying the de novo pre-AEDPA standard of review because the Wisconsin Court of Appeals did not address the claim, the court would nonetheless conclude that Price is not entitled to relief because he was not prejudiced by DeMark's allegedly deficient performance. The toxicology report reflected the status of substances within Price's blood two days after the incident, not at the time of the incident. As Dr. Smail testified, the toxicology report could not indicate whether Price was under the influence of alcohol at the time of the incident. (Docket No. 88 at 84.)

Even if the toxicology report could have indicated whether Price was under the influence of drugs or alcohol at the time of the incident, it would have been unlikely to have affected Dr. Drom's testimony. Intoxication was merely one possible explanation for what the acute delirium he believed Price may have suffered from. Dr. Drom testified that acute delirium might also be brought on by any number of other factors including toxins, fever, metabolic disturbance, or even alcohol withdrawal. Thus, the court finds that if DeMark had provided Dr. Drom with the toxicology report, it would not have affected Dr. Drom's inability to reach a conclusion as to Price's status at the time of the incident.

 **IT IS THEREFORE ORDERED** that Price's petition for a writ of habeas corpus is **denied**. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this <u>21st</u> day of October, 2009.

s/AARON E. GOODSTEIN<br>
U.S. Magistrate Judge